**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| **RELADYNE RELIABILITY SERVICES** | ) | |
| **INC. f/k/a CIRCOR RELIABILITY** | ) | **VERIFIED COMPLAINT** |
| **SERVICES COMPANY AND** | ) | |
| **CLARUS FLUID INTELLIGENCE, LLC,** | ) | **CASE NO: _____** |
| | ) | |
| **Plaintiffs,** | ) | **EMERGENCY INJUNCTIVE RELIEF** |
| **v.** | ) | **REQUESTED** |
| | ) | |
| **CHARLES BRONDER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' VERIFIED COMPLAINT**

Plaintiffs RelaDyne Reliability Services Inc. f/k/a CIRCOR Reliability Services

Company and Clarus Fluid Intelligence, LLC[1] (collectively, "RelaDyne" or "Plaintiffs"), by

counsel, respectfully state as follows for their Verified Complaint against Defendant Charles

Bronder ("Mr. Bronder" or "Defendant"):

## I.    NATURE OF THE ACTION

1.      This is a suit to: (a) prevent the unauthorized and wrongful use and disclosure of

RelaDyne's confidential, proprietary, and/or trade secret information and documents (the

"Confidential Information") by Mr. Bronder, a former RelaDyne managerial employee, and

those in active concert or participation with him; and (b) to enforce the post-employment

contractual obligations Mr. Bronder has recently admitted he is actively violating, including

duties of non-solicitation, non-competition, and non-disclosure.

2.      Mr. Bronder was RelaDyne's Eastern Waterfront Services Manager in charge of

RelaDyne's East Coast operations. RelaDyne terminated his employment in January 2020 for

---

[1] Clarus Fluid Intelligence, LLC is a wholly owned subsidiary of RelaDyne. As discussed in paragraph 10 below,
RelaDyne is the sole member of the LLC.

wrongfully accessing and using confidential pricing information for a purpose other than RelaDyne business. At the time of his termination, Mr. Bronder was the point man for all of RelaDyne's business activities with customers on the East Coast, including RelaDyne's largest customer, the U.S. Navy and its contractors (the "U.S. Navy"). RelaDyne invested a substantial amount of time, money, and resources to provide Mr. Bronder the specialized training and information necessary to be successful in his role, including providing Mr. Bronder access to the Confidential Information.

3.     RelaDyne has recently discovered that, during his employment, Mr. Bronder repeatedly copied and transferred RelaDyne's Confidential Information to his personal email account from a RelaDyne computer. Mr. Bronder is believed to still be in possession of untold amounts of the Confidential Information that would significantly aid a competitor in unfairly competing and causing harm to RelaDyne's business because he has not returned it post-termination as required by his Employment Agreement—notwithstanding multiple requests by RelaDyne that he do so. The Confidential Information believed to be in Mr. Bronder's possession includes highly confidential master data files and project control procedures ("PCPs") developed by RelaDyne specifically for its bids and proposals to the U.S. Navy. RelaDyne maintains these files in a secure, NIST-compliant[2] virtual environment, with access limited to a select few individuals with a business need to know.

4.     RelaDyne's master data files contain detailed pricing and cost information, scheduling breakdowns, and other sensitive business information specifically used by RelaDyne to provide flushing services to U.S. Navy warships. PCPs are similarly highly confidential

---

[2] In 2014, the National Institute of Standards and Technology or "NIST" developed a cybersecurity framework that has become the industry standard. The framework consists of cybersecurity industry standards and best practices designed to help a company like RelaDyne manage and reduce cybersecurity risk. RelaDyne's Confidential Information is maintained in a specially designated, NIST-compliant virtual environment that limits access to only authorized users.

documents developed by RelaDyne and contain its engineering protocols for flushing services on U.S. Navy warships. For national security reasons, the PCP in particular must be transmitted only for authorized purposes with respect to work with the U.S. Navy. Nevertheless, Mr. Bronder transferred the PCP to his personal email account three months before his termination. RelaDyne thus reasonably believes that Mr. Bronder has unlawfully retained the PCP to avoid the significant time and expense necessary to prepare such materials and to use the PCP to unfairly compete with RelaDyne.

5.      As his admissions below demonstrate, RelaDyne recently learned from Mr. Bronder himself that he is violating his post-employment restrictions and plans to inflict significant damage upon RelaDyne's business. Specifically, on June 13, 2020, Mr. Bronder initiated a call with RelaDyne's Director of Finance. During the call, Mr. Bronder boasted about his new competitive employment with Accurate Marine and "total control" of operations with a joint venture, United Mechanical & Flushing Specialists, LLC ("UMFS"), of which Accurate Marine is a member. Mr. Bronder admitted that his new role was directly competitive with his position at RelaDyne. Mr. Bronder stated that UMFS had bought all of the necessary equipment to provide, and that he would directly manage, flushing services, one of the primary services Mr. Bronder was specially trained by RelaDyne to provide to RelaDyne's customers.

6.      Mr. Bronder outlined to RelaDyne's Director of Finance the specific ways he intended to harm RelaDyne's business, primarily by soliciting and retaining RelaDyne's employees and customers. Mr. Bronder explicitly mentioned that RelaDyne would lose several technicians. Mr. Bronder has already made good on this threat, as RelaDyne currently has only one local technician in Virginia, down from approximately ten when Mr. Bronder was still employed. Mr. Bronder also boasted that because he would be working with the same customers

as RelaDyne, he would be in a position to schedule jobs ahead of RelaDyne, and that he would use his competitive position to cause scheduling delays and other business disruptions for RelaDyne. Mr. Bronder was fully aware that by going after RelaDyne's technicians he would cause RelaDyne to rely more on workers from other parts of the country to complete flushing jobs. Thus, he knows that any delays he causes RelaDyne to incur in the performance of projects will inflict thousands of dollars per day in damages, as well as incalculable damage to RelaDyne's goodwill, reputation with customers, and ability to schedule future projects.

7.      Based on the documentary evidence, it is clear that, as he threatened to do, Mr. Bronder had already put into action his plan to take away RelaDyne's customers. Attached as Exhibit 1 are various Requests for Quotation ("RFQ") from RelaDyne customers that Mr. Bronder serviced during his employment. In each of the RFQs, Mr. Bronder is listed as the point of contact for UMFS and/or Accurate Marine—on bids that are in direct competition with those submitted by RelaDyne.

8.      Significantly, the RFQs all have bid due dates between June 16, 2020 and July 8, 2020. This means that, at the same time Mr. Bronder made the call to RelaDyne's Director of Finance, he would have been putting the finishing touches on some of his new employer's competitive bids (the "Competitive Bids") and preparing other Competitive Bids for upcoming RFQ submissions. The customers would have no basis to identify Mr. Bronder as the point of contact for the Competitive Bids using his Accurate Marine email address unless Mr. Bronder or someone else at UMFS or Accurate Marine had previously communicated Mr. Bronder's direct involvement to them and designated him as the point person. Mr. Bronder's acts of contacting, soliciting, and attempting to retain business from the U.S. Navy are all explicitly prohibited by

his post-employment non-solicitation and non-competition covenants in his Employment Agreement.

9.      Based on: (a) Mr. Bronder's continued possession of the Confidential Information, which he copied and transferred to himself over many months and years during his employment with RelaDyne and (b) Mr. Bronder's refusal to comply with his contractual obligations to return RelaDyne's Confidential Information and repeated requests to certify that he does not possess the Confidential Information, it is likely he has disclosed, is disclosing, and/or will inevitably continue to disclose it with the admitted intent of causing significant damage to RelaDyne's business. Mr. Bronder's employment by and wrongful conduct on behalf of Accurate Marine and UMFS put him in position to directly leverage the Confidential Information in his possession to unfairly compete with and harm RelaDyne's business. Injunctive relief is therefore necessary to prevent Mr. Bronder and all those in active concert and participation with him, including Accurate Marine and UMFS, from carrying out Mr. Bronder's plan to cause incalculable damage to RelaDyne.

## II.      **PARTIES**

10.      Plaintiff RelaDyne Reliability Services Inc. f/k/a CIRCOR Reliability Services Company is a corporation organized under the laws of the State of Delaware with its principal place of business at 15150 West Drive, Houston, Texas 77053.

11.      Plaintiff Clarus Fluid Intelligence, LLC is a limited liability company organized under the laws of the State of Alaska with its principal place of business at 4300 B Street, Suite 406, Anchorage, Alaska 99503. Its sole member is RelaDyne Reliability Services Inc.

12.      Defendant Charles Bronder is an individual residing in the Commonwealth of Virginia. Mr. Bronder may be served at his home located at 2404 Litchfield Way, Virginia

Beach, Virginia 23453 or wherever he may be found. This lawsuit arises out of conduct in which

Mr. Bronder engaged in Virginia as a former employee of RelaDyne Reliability Services Inc.

### III.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because

complete diversity of citizenship exists between the Plaintiffs and Defendant and the amount in

controversy is well in excess of $75,000.00, exclusive of interest and costs.

14.     This Court has subject matter jurisdiction over Counts Five and Eight of this

Complaint pursuant to 28 U.S.C. § 1331 because these claims arise under federal law.

15.     This Court also has personal jurisdiction over Mr. Bronder because Mr. Bronder

is domiciled and conducts business in the Commonwealth of Virginia.

16.     Venue is proper in the Eastern District of Virginia under 28 U.S.C. § 1391(b)(1)-

(2), as Mr. Bronder lives in and worked for RelaDyne in this judicial district and engaged in

much of the unlawful conduct described below in this judicial district. Thus, this is the judicial

district where a substantial part of the events giving rise to this Complaint occurred.

17.     Venue is further proper in the Norfolk Division of the Eastern District of Virginia,

consistent with Local Civil Rule 3, because it encompasses the City of Virginia Beach, where

Mr. Bronder resides, as well as the City of Norfolk, where RelaDyne's facilities in the

Commonwealth are located and a substantial part of the events giving rise to this Complaint

occurred.

### IV.     FACTUAL BACKGROUND

#### A.     RelaDyne Is a Leading Provider and Innovator in the Naval Technical Services Industry.

18.     RelaDyne is in the business of manufacturing, selling, distributing, maintaining,

and servicing oil mist lubrication equipment and/or thermojet oil purifiers (and their parts,

accessories, and services), as well as the provision of high-velocity oil flushing, chemical cleaning, varnish mitigation, and mobile oil reclamation services worldwide (the "Business").

19. RelaDyne's Comprehensive Monitored Flush® (CMF), just one aspect of RelaDyne's Business, is recognized as the gold standard throughout the industry. RelaDyne's history as an innovator and reputation for excellence are the product of decades of hard work, tireless effort, and investment in its business, technology, and employees, engendering significant goodwill with RelaDyne's customers.

20. RelaDyne's primary customers are naval and commercial vessels, with RelaDyne's largest customer being the U.S. Navy. To service those customers, RelaDyne maintains a highly proprietary collection of Confidential Information that supports its employees' performance of the Business. The Confidential Information is housed in a NIST-compliant virtual environment. Direct access to the environment is restricted to a select few employees with a business need to know.

**B. Every Position Mr. Bronder Had at RelaDyne Involved Increased Training, Responsibility, and Access to Confidential Information.**

21. Mr. Bronder was hired as a Technician by Clarus Fluid Intelligence, LLC ("Clarus") in 2011. Clarus is now a wholly owned subsidiary of RelaDyne. Before his employment, Mr. Bronder's only prior employment was as a mechanic for the United States Navy, primarily working on mechanical systems aboard U.S. naval vessels. When he joined Clarus, he therefore had no experience with the flushing services aspect of the naval technical services industry and gained all of the technical skills and specialized knowledge needed to perform flushing services from Clarus and its successors.

22. Throughout his employment, Mr. Bronder was trained to perform numerous aspects of the Business and was exposed to increasing amounts of Confidential Information, as

needed. The Confidential Information to which Mr. Bronder was exposed includes, but is not limited to, the proprietary processes, technologies, equipment and components specially designed by RelaDyne to ensure optimal transportation and performance in confined spaces, such as aboard U.S. Navy vessels.

23.     As his knowledge grew through specialized training and exposure to the Confidential Information, Mr. Bronder was promoted to a Project Manager/Senior Project Lead. In this project management role, Mr. Bronder directed crews of employees in the performance of the Business and developed goodwill with customers as the point man for communications during performance of services aboard their vessels. To perform in this role, Mr. Bronder was given increasing and additional access to the Confidential Information, as needed, to track and manage project scheduling and tasks and to ensure their proper and timely completion.

24.     On February 1, 2018, Mr. Bronder was promoted to the role of Eastern Waterfront Services Manager, a position in which he took on increasing business development and personnel management responsibilities on top of his project management duties. In this hybrid, business generation and working-supervisor role, Mr. Bronder became the only management-level employee in the Virginia office, managing a team of approximately ten (10) project leads, technicians, and materials coordinators along the Eastern Waterfront. The team that Mr. Bronder led was key in servicing contracts with the Department of Defense, and in particular the U.S. Navy. Mr. Bronder was specifically involved in leading the response to request for proposals and requests for quotations, identifying new and additional services that could be performed, price quoting, contract negotiating, coordinating payment and discounts, and executing contracts with customers. Mr. Bronder served in this dual capacity until the time of his termination. All of these duties required regular access to and use of the Confidential Information.

25.     On or about April 15, 2019, following RelaDyne's acquisition of Clarus, Mr. Bronder signed the Employment Agreement (the "Employment Agreement"), continuing in his role as Eastern Waterfront Services Manager for RelaDyne and continuing to access ever-increasing amounts of new and updated Confidential Information. To help Mr. Bronder perform his duties, RelaDyne provided Mr. Bronder with two work computers with direct access to the NIST-compliant virtual environment. By virtue of his high-level managerial role, Mr. Bronder was given access to the Confidential Information in the virtual environment pertaining to every aspect of RelaDyne's business, its customers, including the U.S. Navy, its prospective customers, and its employees. More specifically, the Confidential Information to which Mr. Bronder had access included, but was not limited to, customer, supplier, and partner lists and information, referral sources, sales and advertising information and techniques, business plans, acquisition plans, pricing, cost and financial information, equipment designs and schematics, and systems and methods for performing services—none of which is available to the public or known outside of RelaDyne.

26.     Solely through his employment with RelaDyne and its subsidiaries, Mr. Bronder developed and now possesses selective and specialized skills and abilities regarding the unique ways in which RelaDyne performs the Business and establishes, maintains, and expands its relationship with its customers, including the U.S. Navy. Mr. Bronder developed these abilities specifically through receipt of specialized training and access to RelaDyne's highly specialized services and products. By reason of RelaDyne's investment of time, training, and resources, and because RelaDyne gave Mr. Bronder exposure to its customers and other business relationships, Mr. Bronder attained a high level of influence and credibility with RelaDyne's customers and other business relationships, and in particular with the U.S. Navy. It is these very relationships

that RelaDyne protects by having high-level managers such as Mr. Bronder enter into post-employment restrictive covenants.

### C. Mr. Bronder's Employment Agreement Contains Multiple Valid and Enforceable Post-Employment Restrictive Covenants.

27.     In exchange for RelaDyne's provision of Mr. Bronder with continuing employment, access to the Confidential Information, and opportunities to work with RelaDyne's customers, Mr. Bronder entered into the Employment Agreement.[3] The Employment Agreement contains multiple post-employment restrictive covenants—including non-solicitation of customers, non-solicitation of employees, non-competition, and non-disclosure. All of these covenants have subsequently been violated by Mr. Bronder.

28.     Paragraph 5.6 of the Employment Agreement is a non-solicitation covenant that restricts Mr. Bronder, for a period of two (2) years after his termination, from soliciting RelaDyne's customers and employees:

> 5.6     Non-Solicitation. Employee acknowledges that the Company Parties' employees, suppliers, and customers are an integral part of the Company Parties' business and that the loss of such employees, suppliers and/or customers will have a substantial adverse effect on the Company Parties' business.  Therefore, Employee shall not, during the Restricted Period, directly or indirectly, for himself or on behalf of any other person or entity, contact, retain, solicit, or attempt to solicit: (a) any person employed by the Company Parties to become an employee of Employee or any other person or entity; (b) any person performing services or supplying goods to the Company Parties to cease or curtail performing services or supplying goods to the Company Parties or to perform similar services or supply similar goods to Employee or any other person or entity; or (c) any customer of the Company Parties for the purpose of offering such customer products or services that are the same as, similar to, or compete with the Company Parties' then-current products or services, or otherwise cause or induce any such customer to cease or curtail such customer's relationship with the Company Parties.

29.     Of note, this non-solicitation covenant specifically prohibits Mr. Bronder from contacting, retaining, soliciting, or attempting to solicit (a) RelaDyne's employees to leave their

---

[3] RelaDyne has standing to bring claims pertaining to the Employment Agreement because it is the successor in interest to, and was formerly known as, CIRCOR Reliability Services Company, which is defined as the "Company" in the Employment Agreement.

employment to go to work for a competitor and (b) RelaDyne's customers, including the U.S.

Navy, for the purpose of offering such customer products or services that are the same as, similar

to, or compete with RelaDyne's products and services. As discussed below, RelaDyne recently

learned that Mr. Bronder is in violation of both of these provisions of the non-solicitation

covenant.

30.     Paragraph 5.5 of the Employment Agreement is a non-compete covenant that

restricts Mr. Bronder, for a period of two (2) years after his termination, from competing with

RelaDyne by working for a competitor engaged in the Business:

> 5.5     Non-Compete.  Employee acknowledges and agrees that the Company
> Parties are engaged in the highly competitive business of (i) providing the manufacture, sale and,
> distribution, maintenance or service of oil mist lubrication equipment and/or thermojet oil purifiers
> (and in each case all associated parts, accessories and/or services), and/or (ii) high-velocity oil
> flushing, chemical cleaning, varnish mitigation services, and/or mobile oil reclamation or the
> provision of lubrication, flushing or chemical cleaning services worldwide (the "Business").

> Employee further acknowledges and agrees that because of the highly competitive nature of the
> Business, use and protection of the Confidential Information is critical to the Company's continued
> successful operation and business and is an essential part of this Agreement.     Accordingly,
> Employee shall not, during Employee's employment and for a period of two (2) year after
> termination of Employee's employment for any reason, whether voluntary or involuntary (the
> "Restricted Period"), directly or indirectly, alone or in association with any other person, firm,
> corporation or other business organization be employed by, perform services for, or otherwise
> associate with in any capacity (including, without limitation, as investor, owner, lender, consultant,
> contractor, joint venturer or partner) with any person or entity that is engaged in a business that is
> the same or substantially similar to all or any portion of the Business anywhere in the world.
> Notwithstanding the preceding, this Section 5.5 will not prevent Employee from owning up to 2%
> of the voting securities of any publicly traded company.

31.     As discussed below, Mr. Bronder's admitted employment with one of RelaDyne's

direct competitors, in a substantially identical job servicing primarily the same customers,

constitutes a clear violation of this non-competition covenant.

32.     Paragraph 5.1 of the Employment Agreement is a confidentiality and non-disclosure covenant that prohibits Mr. Bronder from disclosing the Confidential Information after his employment with RelaDyne ends:

> 5.1     Confidentiality. Employee acknowledges and agrees that Employee has and/or will acquire access to certain information concerning the business and affairs of the Company and all entities that, directly or indirectly, control, are controlled by, or are under common control with the Company (collectively, the "Company Parties") (including customer lists and information, referral sources, sales and advertising information and techniques, ideas, trade secrets, know-how, systems, methods, business plans, acquisition plans, pricing, cost and financial information and other information) that is not generally available to the public (collectively, "Confidential Information"). Employee agrees that Employee will not, at any time during or after the period of employment by Company, directly or indirectly, disclose or reveal Confidential Information to any person, firm or corporation or use the Confidential Information for any purpose, in each case except as authorized in writing by the Company or where reasonably necessary in furtherance of Employee's performance under this Agreement on behalf of the Company.

33.     This confidentiality and non-disclosure covenant expressly defines the Confidential Information to include information concerning the business and affairs of RelaDyne and all entities that are directly or indirectly controlled by RelaDyne, including Clarus. Based on the conduct described below, RelaDyne has reason to believe Mr. Bronder has violated, is violating, or inevitably will violate this confidentiality and non-disclosure covenant in the course of his employment with Accurate Marine.

34.     Finally, Paragraph 5.2 of the Employment Agreement is a return of Confidential Information covenant that requires Mr. Bronder to return RelaDyne's Confidential Information in his possession immediately after his employment with RelaDyne ends:

> 5.2     Return of Confidential Information. Upon the last day of Employee's employment with the Company for any reason whatsoever or upon the written request of the Company, Employee shall immediately return to the Company all Confidential information and all copies and abstracts thereof, and Employee shall certify in writing to the Company that Employee has not retained originals, copies, or abstracts of any Confidential Information.

35.     Notably, this covenant contains a requirement that Mr. Bronder certify in writing that he has not retained originals, copies, or abstracts of any Confidential Information. As

discussed below, Mr. Bronder did not provide this certification immediately after his employment ended, as he was required to do by the Employment Agreement. He also has not provided such written assurances in response to multiple requests from RelaDyne that he do so.

> **D.     RelaDyne Terminated Mr. Bronder's Employment for Accessing Confidential Information for Purposes Unrelated to Its Business.**

36.     RelaDyne terminated Mr. Bronder's employment on January 7, 2020, after it was discovered that Mr. Bronder was accessing and manipulating certain of RelaDyne's Confidential Information for a purpose unrelated to RelaDyne business. Specifically, a RelaDyne employee observed that on one of Mr. Bronder's work computers, Mr. Bronder had manipulated one of RelaDyne's pricing tools used to prepare bids for projects with customers, including changing the logo on the pricing tool to reflect a different company's name. Mr. Bronder's engagement in these activities did not serve or further RelaDyne's business interests.

37.     When confronted about this conduct by his manager and a member of the human resources department, Mr. Bronder claimed that he was merely "playing with logos." Tellingly, during that conversation, Mr. Bronder did not deny that he was planning to go into business either for himself or with one of RelaDyne's competitors, which was obviously his intention and is exactly what he has since done.

38.     Therefore, on January 14, 2020, RelaDyne sent Mr. Bronder a letter reminding him of his post-employment obligations, including his covenant not to compete, not to solicit RelaDyne's customers or employees, and not to disclose the Confidential Information. Mr. Bronder never responded to this letter.

**E.     The Global Coronavirus Pandemic Obscured the Extent of
Mr. Bronder's Wrongful Competitive Activities Until Recently.**

39.     In the days and weeks following Mr. Bronder's termination, RelaDyne remained

concerned that Mr. Bronder would go into business for himself or with a competitor to unfairly

compete with RelaDyne.

40.     Shortly after his termination, however, the coronavirus pandemic rapidly spread

across the U.S. and globally, causing significant business interruptions and disrupting the flow of

information from the industry that would have alerted RelaDyne to Mr. Bronder's competitive

activities.

41.     It was not until June 13, 2020 that RelaDyne learned from Mr. Bronder himself,

in a call he made to RelaDyne's Director of Finance, that he was working for a direct competitor

and soliciting RelaDyne's customers and employees in violation of his non-solicitation and non-

competition restrictive covenants. Mr. Bronder admitted that his new role was directly

competitive with his former position at RelaDyne, stating that UMFS had bought all of the

necessary equipment to provide, and that he would directly manage, flushing services, one of the

primary services Mr. Bronder was specially trained to provide to RelaDyne's customers.

42.     Mr. Bronder also outlined the specific ways in which he intended to harm

RelaDyne's business, primarily by soliciting and retaining RelaDyne's employees and

customers. Mr. Bronder explicitly referenced the decrease in the number of technicians on

RelaDyne's staff, all of whom he had previously managed at RelaDyne but contractually agreed

not to solicit. RelaDyne currently has one local technician, down from approximately ten local

technicians at the time of Mr. Bronder's termination. Mr. Bronder was aware that the loss of

technicians in Virginia would force RelaDyne to source technicians from its operations in other

parts of the country, increasing its costs and slowing down its service to customers.

14

43.     With his intimate knowledge of RelaDyne's business operations, and because he is employed in a competitive position servicing the exact same customers as RelaDyne, Mr. Bronder also threatened to manipulate the project completion dates for Accurate Marine and UMFS jobs to disrupt RelaDyne's business operations. Specifically, Mr. Bronder stated that he would cause delays on Accurate Marine and/or UMFS projects, which would delay the start of RelaDyne's subsequent projects aboard those same vessels, causing significant scheduling problems and unforeseen delay. This would, in turn, cause thousands of dollars per day in actual damages (which damages Mr. Bronder knew would be heightened by the loss of local technicians and the cost to supply technicians from other parts of the country), and would cause incalculable damage to RelaDyne's goodwill, reputation with customers, and ability to schedule and take on future projects.

44.     True to his word, RelaDyne began to see Mr. Bronder listed as the point of contact for UMFS and Accurate Marine (on his new work email), along with RelaDyne employees and other prospective bidders, on the same Requests for Quotation (RFQ) for the same services contracts for the U.S. Navy. Attached as Exhibit 1 are various Requests for Quotation ("RFQ") from RelaDyne customers that Mr. Bronder serviced during his employment. In each of the RFQs, Mr. Bronder is listed as the point of contact for UMFS and/or Accurate Marine—in direct competition with RelaDyne.

45.     The RFQs all have bid due dates between June 16, 2020 and July 8, 2020, meaning that—at the time Mr. Bronder made the call to RelaDyne's Director of Finance—he would have been finalizing some Competitive Bids and preparing others for upcoming RFQ submissions. The customers would have no reason to list Mr. Bronder as the point of contact for Accurate Marine and/or UMFS using his Accurate Marine email address unless Mr. Bronder or

someone else at UMFS or Accurate Marine had previously communicated Mr. Bronder's contact information to them and designated him as the point person. Mr. Bronder's acts of contacting, soliciting, and attempting to retain business from the U.S. Navy are all explicitly prohibited by his post-employment non-solicitation and non-competition covenants in his Employment Agreement with RelaDyne.

### F.    Mr. Bronder Failed to Provide Requested Assurances That He Would Honor His Contractual Obligations to RelaDyne.

46.    On June 24, 2020, RelaDyne, through counsel, sent Mr. Bronder and UMFS a cease-and-desist letter requesting several written assurances that Mr. Bronder would honor his post-employment restrictive covenants. Specifically, RelaDyne requested that Mr. Bronder and UMFS confirm that Mr. Bronder did not possess (or would return) and would not use RelaDyne's Confidential Information. RelaDyne also requested that Mr. Bronder and UMFS confirm that Mr. Bronder would not unfairly compete and solicit RelaDyne's customers and employees.

47.    On June 29, 2020, RelaDyne received a written response from counsel for Mr. Bronder and UMFS. Mr. Bronder's counsel, apparently unaware of his client's prior admissions to RelaDyne's Director of Finance, denied that Mr. Bronder was competing with RelaDyne, soliciting RelaDyne's customers and employees, or using the Confidential Information. Mr. Bronder's counsel confirmed, however, that Mr. Bronder is working for Accurate Marine, one of RelaDyne's direct competitors. No written assurances, as requested, were provided by Mr. Bronder or UMFS. In subsequent telephone conversations, Mr. Bronder's counsel suggested Mr. Bronder's role with Accurate Marine was strictly operational, but the evidence proves otherwise.

48.    RelaDyne responded on July 1, 2020, alerting Mr. Bronder's counsel that it had evidence of Mr. Bronder's involvement on behalf of Accurate Marine and/or UMFS in specific

bids for services with the U.S. Navy, in direct competition with RelaDyne. RelaDyne requested, for a second time, that Mr. Bronder and UMFS provide the requested written assurances. No such assurances were provided. Not surprisingly, Mr. Bronder's counsel ceased communicating with RelaDyne's counsel on or about Wednesday, July 8, 2020, at the same time the most recent Competitive Bid was due for submission to the U.S. Navy. All of these communications are attached as Exhibit 2.

**G.    RelaDyne's Forensic Investigation Revealed Mr. Bronder's Acts of Misappropriation and Plans to Unfairly Compete.**

49.    Thereafter, a forensic review of the computers that Mr. Bronder used during his employment with RelaDyne uncovered evidence that Mr. Bronder repeatedly and intentionally caused RelaDyne's Confidential Information to be transferred or copied to his personal Gmail account in the months before his termination. In just one example, on or about September 10, 2019, Mr. Bronder transferred a PCP, curated and developed by RelaDyne for conducting business with the U.S. Navy, from his RelaDyne email account to his personal Gmail account. The PCP contains RelaDyne's engineering protocols and procedures with respect to how RelaDyne performs flushing services (one aspect of the Business) on a warship for the U.S. Navy. PCPs are highly confidential, containing sensitive and proprietary information about the infrastructure of U.S. naval vessels. Thus, for national security reasons, PCPs must be transmitted only for authorized purposes with respect to work with the U.S. Navy. In another example, Mr. Bronder blind copied his personal email on a business communication, thereby knowingly acquiring a copy of a master project file. That file contained detailed pricing and cost information, scheduling breakdowns, and other sensitive business information relevant to the provision of flushing services to U.S. Navy warships.

50.     The very fact that Mr. Bronder accessed his RelaDyne computer to transfer the PCP and master project file to his personal email account belies any argument that Mr. Bronder was performing RelaDyne business by transferring Confidential Information to his personal possession. Instead, it shows that—for many months before his termination—Mr. Bronder was misusing RelaDyne's computer and computer systems to actively curate a library of RelaDyne's Confidential Information in preparation to compete with RelaDyne and, as Mr. Bronder now admits, to cause significant damage to RelaDyne's business.

## V.     CAUSES OF ACTION

### COUNT ONE:
### (Breach of Contract: Non-Solicitation of Customers and Employees)

51.     RelaDyne repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

52.     Among other duties, the Employment Agreement imposes on Mr. Bronder certain restrictions with respect to solicitation of RelaDyne's customers and employees for a period of two years following his termination of employment, as set forth in paragraph 5.6 of the Employment Agreement.

53.     The non-solicitation covenant in paragraph 5.6 of the Employment Agreement is valid and enforceable.

54.     Mr. Bronder was terminated on January 7, 2020.

55.     In June 2020, a mere six months later, RelaDyne learned that Mr. Bronder was actively soliciting RelaDyne's customers, including but not limited to the U.S. Navy, in competition for the same business for which RelaDyne was submitting bids.

56. RelaDyne has also learned that Mr. Bronder solicited at least one former RelaDyne employee whom Mr. Bronder managed during his employment with RelaDyne has left RelaDyne to go work with Mr. Bronder at Accurate Marine and/or UMFS.

57. By engaging in the foregoing conduct, Mr. Bronder is in violation of the non-solicitation covenant in the Employment Agreement.

58. As a direct and proximate result of Mr. Bronder's breaches, RelaDyne has suffered and continues to suffer damages.

59. RelaDyne is entitled to an award of any and all damages already caused by Mr. Bronder's breaches of his obligations in an amount to be determined and proven at the time of trial.

60. Moreover, because Mr. Bronder's breach of the non-solicitation covenant threatens to irreparably harm RelaDyne's business and goodwill with customers, RelaDyne is entitled to injunctive relief.

61. Mr. Bronder's own admissions demonstrate that he has acted in bad faith and has caused RelaDyne unnecessary trouble and expense. RelaDyne is therefore entitled to an award of its attorneys' fees and the costs of this litigation under applicable law.

**COUNT TWO:**
**(Breach of Contract: Confidentiality and Non-Disclosure)**

62. RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

63. Among other duties, the Employment Agreement imposes on Mr. Bronder certain restrictions with respect to confidentiality and non-disclosure of RelaDyne's Confidential Information, as set forth in Paragraph 5.1 of the Employment Agreement.

64.     The confidentiality and non-disclosure covenant in paragraph 5.1 of the Employment Agreement is valid and enforceable.

65.     Mr. Bronder has breached, is in breach, or inevitably will breach the confidentiality and non-disclosure covenant in paragraph 5.1 of the Employment Agreement.

66.     Mr. Bronder is actively using RelaDyne's Confidential Information to solicit the same RelaDyne customers Mr. Bronder serviced during his employment with RelaDyne, even bidding in response to the same RFQs from such customers for which RelaDyne is bidding, in an effort to induce them to do business with Accurate Marine and/or UMFS and not RelaDyne.

67.     As a direct and proximate result of Mr. Bronder's breach, RelaDyne has suffered and continues to suffer damages.

68.     RelaDyne is entitled to an award of any and all damages already caused by Mr. Bronder's breach of the confidentiality and non-disclosure covenant in paragraph 5.1 of the Employment Agreement, in an amount to be determined and proven at the time of trial.

69.     Moreover, because Mr. Bronder's breach of the confidentiality and non-disclosure covenant threatens to irreparably harm RelaDyne's business and goodwill with customers, RelaDyne is entitled to injunctive relief.

70.     Mr. Bronder's own admissions demonstrate that he has acted in bad faith and has caused RelaDyne unnecessary trouble and expense. RelaDyne is therefore entitled to an award of its attorneys' fees and the costs of this litigation under applicable law.

### COUNT THREE:
### (Breach of Contract: Return of Property)

71.     RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

72.     Among other duties, paragraph 5.2 of the Employment Agreement imposes on Mr. Bronder a duty to return all of RelaDyne's Confidential Information immediately upon the termination of his employment and to certify in writing to RelaDyne that he has not retained originals, copies, or abstracts of any of the Confidential Information.

73.     Mr. Bronder has not complied with paragraph 5.2 of the Employment Agreement because he has not certified in writing that he has not retained originals, copies, or abstracts of any of the Confidential Information.

74.     RelaDyne has recently learned that Mr. Bronder remains in possession of RelaDyne's Confidential Information.

75.     RelaDyne, on multiple occasions, sought written assurances from Mr. Bronder, as called for by the Employment Agreement, that he has not retained the Confidential Information. Mr. Bronder has not provided those written assurances.

76.     Mr. Bronder's actions and RelaDyne's evidence demonstrate that he is in breach of paragraph 5.2 of the Employment Agreement.

77.     As a direct and proximate result of Mr. Bronder's breach, RelaDyne has suffered and continues to suffer damages.

78.     RelaDyne is entitled to an award of any and all damages already caused by Mr. Bronder's breach of the return of Confidential Information covenant in paragraph 5.2 of the Employment Agreement, in an amount to be determined and proven at the time of trial.

79.     Moreover, because Mr. Bronder's breach of the return of Confidential Information covenant threatens to irreparably harm RelaDyne's business and goodwill with customers, RelaDyne is entitled to injunctive relief.

80.     Mr. Bronder's own admissions demonstrate that he has acted in bad faith and has caused RelaDyne unnecessary trouble and expense. RelaDyne is therefore entitled to an award of its attorneys' fees and the costs of this litigation under applicable law.

### COUNT FOUR:
### (Breach of Contract: Non-Competition)

81.     RelaDyne repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

82.     Among other duties, the Employment Agreement imposes on Mr. Bronder certain restrictions with respect to non-competition with RelaDyne for a period of two (2) years following his termination of employment, as set forth in paragraph 5.5 of the Employment Agreement.

83.     Specifically, the non-competition covenant prohibits Mr. Bronder from directly or indirectly being employed by, performing services for, or otherwise being associated with any person or entity engaged in the Business in competition with RelaDyne.

84.     The non-competition covenant in paragraph 5.5 of the Employment Agreement is valid and enforceable.

85.     Mr. Bronder was terminated on January 7, 2020.

86.     On June 13, 2020, a mere six months later, Mr. Bronder admitted to RelaDyne's Director of Finance that he was actively working for one of RelaDyne's direct competitor. Document evidence further reveals that Mr. Bronder is actively competing to provide services to the same RelaDyne customers, including but not limited to the U.S. Navy, for the same bids that RelaDyne is bidding on, on behalf of Accurate Marine and/or UMFS.

87.     Based on all of the above conduct, Mr. Bronder is in violation of the non-competition covenant in paragraph 5.5 of the Employment Agreement.

88.     As a direct and proximate result of Mr. Bronder's breaches, RelaDyne has suffered and continues to suffer damages.

89.     RelaDyne is entitled to an award of any and all damages already caused by Mr. Bronder's breaches of his obligations in an amount to be determined and proven at the time of trial.

90.     Moreover, because Mr. Bronder's breach of the non-competition covenant threatens to irreparably harm RelaDyne's business and goodwill with customers, RelaDyne is entitled to injunctive relief.

91.     Mr. Bronder's own admissions demonstrate that he has acted in bad faith and has caused RelaDyne unnecessary trouble and expense. RelaDyne is therefore entitled to an award of its attorneys' fees and the costs of this litigation under applicable law.

### COUNT FIVE:
### (Federal Defend Trade Secrets Act)

92.     RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

93.     The Federal Defend Trade Secrets Act (the "DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

94.     Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B)

the information derives independent economic value, actual or potential, from not being generally known, to and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839 (3) (as amended).

95.     Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839 (5) (as amended).

96.     RelaDyne's Confidential Information constitutes trade secrets, as that term is defined in the DTSA, related to a product or service used in, or intended for use in, interstate commerce.

97.     RelaDyne's Confidential Information was developed and/or compiled over time and after the expenditure of significant efforts and monetary sums.

98.     RelaDyne derives economic value from the fact that its Confidential Information is not generally known to individuals or entities outside of RelaDyne, including competitors.

24

99.     RelaDyne takes reasonable measures to protect the secrecy of such information. These measures include, but are not limited to, (a) storing the Confidential Information in a NIST-compliant virtual environment, (b) limiting access to the environment to a limited number of employees with a business need to know, and (c) entering confidentiality and non-disclosure agreements with its employees.

100.    Mr. Bronder acquired RelaDyne's Confidential Information under circumstances giving rise to a duty to maintain the secrecy of the trade secrets, which derive value from not being known or readily ascertainable by those outside of RelaDyne.

101.    Mr. Bronder knew he had a duty to maintain the secrecy of RelaDyne's Confidential Information due, in part, to his acknowledgment under Paragraph 5.1 of the Employment Agreement, entitled "Confidentiality."

102.    During his employment with RelaDyne, Mr. Bronder misappropriated the Confidential Information, including emailing the Confidential Information to his personal email without authorization from RelaDyne.

103.    Mr. Bronder's position with Accurate Marine, a direct competitor, involves bidding on the exact same jobs for the exact same customers that Mr. Bronder bid on during his employment with RelaDyne.

104.    It is inevitable that Mr. Bronder, in the performance of his duties for Accurate Marine, has used or disclosed or will use or disclose the RelaDyne Confidential Information to unfairly compete against RelaDyne to advance the business interests of Accurate Marine and/or UMFS.

105.    Mr. Bronder's actions constitute actual and threatened misappropriation in violation of the DTSA.

106.    As a result of Mr. Bronder's willful and malicious misappropriation of RelaDyne's trade secrets, RelaDyne has suffered and continues to suffer damages in an amount to be proven at trial.

107.    Mr. Bronder's actions will also continue to cause irreparable harm and damages to RelaDyne, its Confidential Information, and its goodwill with its customers, if Mr. Bronder is not restrained.

108.    In addition to equitable relief, RelaDyne is entitled to recover actual damages from Mr. Bronder, as well as its attorneys' fees.

## COUNT SIX:
### (Virginia Uniform Trade Secrets Act)

109.    RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

110.    The Virginia Uniform Trade Secrets Act ("VUTSA") forbids threatened and actual misappropriation of trade secrets. *See* Va. Code § 59.1-336 *et seq*.

111.    The Confidential Information constitutes RelaDyne's "trade secrets," as that term is defined in Va. Code § 59.1-336. RelaDyne derives independent economic value from the Confidential Information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. The Confidential Information is the subject of reasonable efforts to maintain its secrecy.

112.    Mr. Bronder misappropriated the Confidential Information by acquisition, use, and/or disclosure where Mr. Bronder knew or had reason to know that he acquired the Confidential Information by "improper means" as that term is defined in Va. Code § 59.1-336.

113.    Mr. Bronder further misappropriated the Confidential Information by acquisition, use, and/or disclosure where Mr. Bronder knew or had reason to know that his knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain secrecy and limit use, within the meaning of Va. Code § 59.1-336.

114.    Mr. Bronder's actions constitute actual or threatened misappropriation which will cause RelaDyne irreparable harm unless enjoined pursuant to Va. Code § 59.1-337.

115.    RelaDyne has suffered and will continue to suffer actual damages caused by Mr. Bronder's misappropriation of its trade secrets, and Mr. Bronder has been unjustly enriched by his misappropriation of RelaDyne's trade secrets.

116.    Mr. Bronder's misappropriation of RelaDyne's trade secrets was willful and malicious, entitling RelaDyne to an award of exemplary damages in an amount authorized by Va. Code § 59.1-338(B).

117.    Pursuant to Va. Code § 59.1-338.1, RelaDyne is entitled to an award of its attorneys' fees and costs incurred in this action because Mr. Bronder has willfully and maliciously misappropriated RelaDyne's trade secrets.

## COUNT SEVEN:
### (Virginia Computer Crimes Act)

118.    RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

119.    The Virginia Computer Crimes Act ("VCCA") authorizes civil remedies for use of a computer or computer network to convert and/or make unauthorized copies of the property of another. *See* Va. Code § 18.2-152.1 *et seq.*

120.    RelaDyne's computer and computer systems constitute a "computer" as that term is defined by Va. Code § 18.2-152.2.

121.     RelaDyne's computers, computer terminals, servers, and related devices and software constitute a "computer network" as that term is defined by Va. Code § 18.2-152.2.

122.     Mr. Bronder's use of RelaDyne's computers and computer networks to obtain Confidential Information of RelaDyne was "without authority," as that term is defined by Va. Code § 18.2-152.2.

123.     Mr. Bronder used RelaDyne's computers and computer networks with knowledge that such use was without authority, and with the intention of taking or appropriating the property of RelaDyne, in violation of Va. Code § 18.2-152.1 *et seq.*

124.     Mr. Bronder used RelaDyne's computers and computer networks with knowledge that such use was without authority, and with the intention of converting RelaDyne's property to his own use in violation of Va. Code § 18.2-152.3.

125.     Mr. Bronder used RelaDyne's computers and computer networks with knowledge that such use was without authority, and with the intention of making an unauthorized copy of the Confidential Information, in violation of Va. Code § 18.2-152.4(6).

126.     RelaDyne has been injured by reason of Mr. Bronder's violations of Va. Code § 18.2-152.1 *et seq.*, and is entitled to an award of damages and costs of suit against Mr. Bronder in an amount to be determined at trial, as authorized by Va. Code § 18.2-152.12.

## COUNT EIGHT:
### (Computer Fraud and Abuse Act)

127.     RelaDyne repeats and re-alleges each and every allegation set forth above, as if fully set forth herein.

128.     The federal Computer Fraud and Abuse Act ("CFAA") prohibits unauthorized access of a protected computer with intend to defraud and obtain anything of value. *See* 18 U.S.C. § 1030 *et seq.*

129.     RelaDyne's computers and computer systems constitute a "protected computer" as that term is defined in 18 U.S.C. § 1030.

130.     Mr. Bronder repeatedly and intentionally accessed a protected computer belonging to RelaDyne without authorization and/or in excess of his authorization going at least as far back as 2015.

131.     Mr. Bronder's conduct resulted in his fraudulently obtaining RelaDyne's Confidential Information from a protected computer.

132.     As a direct and proximate result of Mr. Bronder's intentional and fraudulent conduct, RelaDyne has suffered damages exceeding $5,000. RelaDyne's losses include costs associated with the internal investigation of Mr. Bronder's conduct and attorneys' fees.

## VI.     PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

133.     Mr. Bronder is actively breaching his contractual and legal obligations to RelaDyne by servicing and soliciting competitive services with RelaDyne's customers and misappropriating RelaDyne's Confidential Information. There is a very real, actual, and imminent threat that Mr. Bronder will continue to injure RelaDyne irreparably if an injunction is not entered enforcing Mr. Bronder's contractual and legal obligations to RelaDyne.

134.     Mr. Bronder is actively communicating with and soliciting RelaDyne's customers on behalf of Accurate Marine and/or UMFS. Mr. Bronder's activities include acting as the point person in the bidding process on Requests for Quotation in competition with RelaDyne.

135.     RelaDyne has suffered irreparable harm as a result of Mr. Bronder's breaches of his contractual and legal obligations.

136. Such continuing injury cannot be quantified or remedied through monetary damages because it includes not only the loss of business, but also the loss of goodwill and confidentiality of the Confidential Information and therefore the value in that secrecy.

137. If not restrained, Mr. Bronder's actions will continue to cause irreparable harm and damages to RelaDyne.

138. Based on the foregoing factual allegations, RelaDyne seeks a temporary restraining order and preliminary and permanent injunction enjoining and restraining Mr. Bronder, and all those in active concert and participation with him, from :(a) using in any manner, or otherwise disclosing to any third party, any and all information in his possession, custody, or control which Mr. Bronder received, took, obtained, or retained from RelaDyne; and (b) violating his restrictive covenants in the Employment Agreement, namely his non-solicitation of customers, non-solicitation of employees, non-competition, and non-disclosure covenants.

## VII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Mr. Bronder as follows:

1. That Mr. Bronder, and all those in active concert and participation with him, be temporarily restrained and preliminarily and permanently enjoined from further violations of the non-solicitation of customers, non-solicitation of employees, and non-competition restrictive covenants in the Employment Agreement;

2. That Mr. Bronder, and all those in active concert or participation with him, be temporarily restrained and preliminary and permanently enjoined from further use or disclosure of RelaDyne's Confidential Information;

3. For an order requiring Mr. Bronder to return to RelaDyne, and make no use of, all property and information belonging to RelaDyne, including the Confidential Information;

4.      That RelaDyne be awarded a judgment against Mr. Bronder in an amount to be determined and proved at the time of trial;

5.      For an award of RelaDyne's reasonable attorneys' fees and expenses of litigation incurred in pursing this Complaint;

6.      That RelaDyne be awarded its costs of suit and an assessment of interest, including prejudgment interest; and

7.      For such other relief as this Court deems just, proper and equitable under the circumstances.

Dated this 20th day of July, 2020.

Respectfully submitted,

FOLEY & LARDNER LLP

By      */s/ Michael J. Lockerby*
            Michael J. Lockerby

Michael J. Lockerby (VSB No. 24003)
FOLEY & LARDNER LLP
Washington Harbour
3000 K. Street, N.W., Sixth Floor
Washington, D.C. 20007-5143
(202) 672-5300 (phone)
(202) 672-5399 (fax)

Cristina Portela Solomon (*pro hac vice* motion pending)
Michael F. Ryan (*pro hac vice* motion pending)
FOLEY & LARDNER LLP
1000 Louisiana Street, Suite 2000
Houston, Texas 77002
(713) 276-5500 (phone)
(713) 276-5555 (fax)

*Counsel for Plaintiffs, RelaDyne Reliability Services Inc. f/k/a*
*CIRCOR Reliability Services Company, and Clarus Fluid Intelligence, LLC*

## DECLARATION IN SUPPORT OF VERIFIED COMPLAINT

I, Todd Cash, having read the foregoing Verified Complaint and, pursuant to 28 U.S.C. § 1746, verify under penalty of perjury under the laws of the United States of America that the facts stated therein that relate to Plaintiffs RelaDyne Reliability Services Inc. and Clarus Fluid Intelligence, LLC are true and correct to the best of my knowledge, information, and belief.

Date: July 20, 2020

_____

Todd Cash
Director of Finance
RelaDyne Reliability Services Inc.